UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN E. SCOTT, | ) | CASE NO. 5:18CV2897 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| ANDREW M. SAUL[1], | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Shawn E. Scott ("Plaintiff") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant") denying his applications for disability insurance benefits ("DIB"), and supplemental security income ("SSI"). ECF Dkt. #7. In his brief on the merits, filed on May 16, 2019, Plaintiff asserts that the administrative law judge's ("ALJ") determination of his residual functional capacity ("RFC") is not supported by substantial evidence because it contained less mental health limitations than those supported by the medical record and mental health professionals. ECF Dkt. #15. For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's case in its entirety WITH PREJUDICE.

## I.     PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on February 2, 2015 and October 19, 2015, respectively, alleging disability beginning November 10, 2013 due to degenerative disc disease ("DDD") of the back, anxiety, depression, neck problems, high blood pressure, irregular heart beat, and a mini stroke in 2009. ECF Dkt. #14.[2] Tr. at 17, 82, 83, 271-283, 339. Plaintiff thereafter amended his alleged onset date on both applications to July 30, 2014. *Id.* at 309.

---

[1] On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security, replacing acting Commissioner Nancy A. Berryhill.

[2] Transcript hereinafter referred to as Tr.

Plaintiff's applications were denied initially and upon reconsideration. *Id.* at 82-83, 118, 134, 150, 161, 180-208.

Plaintiff subsequently requested an administrative hearing and on February 14, 2018, a hearing was held before an ALJ in which Plaintiff, with counsel present, and a vocational expert ("VE") testified. Tr. at 38, 209. On May 4, 2018, the ALJ issued his decision denying Plaintiff's applications for DIB and SSI. *Id.* at 17-31. Plaintiff requested a review of the hearing decision, and on October 16, 2018, the Appeals Council denied review. *Id.* at 1-4, 270.

Plaintiff filed a complaint in this Court on December 17, 2018 seeking review of the ALJ's decision. ECF Dkt. #1. He thereafter filed an amended complaint on January 4, 2019. ECF Dkt. #7. Plaintiff filed a merits brief on May 16, 2019, and Defendant filed a merits brief on July 1, 2019. ECF Dkt. #s 15, 17. Plaintiff filed a reply brief on July 15, 2019. ECF Dkt. #18.

## II. **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

Plaintiff alleges that substantial evidence does not support the ALJ's RFC finding because the medical record and mental health professional opinions support more mental health limitations than those included in the ALJ's mental RFC for him. ECF Dkt. #15 at 2. Since Plaintiff confines his assertion of error to limitations resulting from his mental health conditions, the undersigned will focus on the relevant medical evidence relating to only those conditions.

Family practice medical records dated July 18, 2013 indicate that Plaintiff's past medical history included depression as a teenager and panic/anxiety. Tr. at 408. February 24, 2014 treatment notes indicate that Plaintiff presented for neck pain, but also requested medication for his worsening depression. *Id.* at 466. His doctor prescribed 20mg of Prozac once per day. *Id.* April 15, 2014 treatment notes by his family practice doctor indicate that Plaintiff requested an increase in his Prozac prescription for depression, which was increased to 40mg per day. *Id.* at 458. An examination by his family practice physician indicated that Plaintiff had no anxiety, depression or stress on May 20, 2014. *Id.* at 418.

On August 29, 2014, Plaintiff presented to his family practice physician complaining of depression and feeling down. Tr. at 436. He indicated that he struggled with depression since he was a child and he had mood swings. *Id.* He explained that he had a very traumatic

upbringing as he was neglected and emotionally abused, as well as physically abused, locked in a dark room, and molested while he was in foster care from birth through the age of 12. *Id.* Plaintiff reported that he still had intrusive, recurring thoughts about these experiences and has nightmares nearly every night. *Id.* He also suffered from irritability, insomnia, and avoidance of dark rooms, groups of people and public places, and he was unable to recall certain aspects of the trauma. Id. He also indicated that he felt isolated, had social withdrawal, and feelings of numbness and detachment, and he was easily startled. *Id.* He further felt fatigued, had poor concentration, increased appetite, and was dealing with current stressors of trying to obtain the custody of his children, meeting his biological mother for the first time, which had gone poorly, and financial and relationship difficulties. *Id.* Plaintiff reported that he was first seen by a mental health provider when he was in foster care and he received treatment intermittently as a child, and he last saw a mental health professional when he was age 23. *Id.* at 436. He reported being hospitalized for psychiatric reasons in his early 20s for a suicide attempt by electrocution and for self-mutilation. *Id.* He had prior prescriptions of Cymbalta, Ativan, Xanax, and Ritalin. *Id.*

Upon a mental status examination, Dr. Yoder indicated that Plaintiff was alert and oriented, well-groomed, he fidgeted in his chair intermittently, had regular rate and rhythm of speech, was polite and appropriate, made appropriate eye contact, had a "depressed mood" and was mildly dysphoric and congruent with his mood. Tr. at 437. Dr. Yoder described Plaintiff's thought process as normal, with no delusions or hallucinations, intact memory, cognition, and concentration and attention, *Id.* He diagnosed Plaintiff with post-traumatic stress disorder ("PTSD"), a rule out of major recurrent moderate depressive disorder, some physical diagnoses and situational stressors. *Id*. He rated Plaintiff's global assessment of functioning ("GAF") score as 50, indicative of moderate symptoms. *Id*. He prescribed Plaintiff Zoloft, referred him to Ms. Gebhart for therapy, ordered labs, and recommended that Plaintiff limit his caffeine intake. *Id*. at 437-438.

On September 12, 2014, Plaintiff presented to his family practice physician complaining of depression and anxiety. Tr. at 431. He stated that he was taking his medication as prescribed and his mood felt the same, as he was still struggling with intrusive, recurring thoughts about his

3

prior traumas and was having nightmares a few times per week. *Id*. He reported irritability, insomnia and avoidance of dark rooms, groups of people and public places, and isolation and social withdrawal. *Id.* A behavioral health outpatient assessment was conducted by Dr. Yoder, who found that Plaintiff was not a threat to himself or others, and his GAF score was 50, indicative of moderate symptoms. *Id*. at 430. He further indicated that Plaintiff was alert and oriented, fidgeted in his seat intermittently, had normal rate and rhythm of speech, appropriate eye contact, normal thought process, grossly intact memory and cognition, and fair insight and judgment. *Id.* at 432. Dr. Yoder diagnosed Plaintiff with PTSD, major recurrent moderate depressive disorder, some physical diagnoses and situational stressors. *Id*. His plan was to continue Plaintiff on Zoloft, discuss changing Metoprolol prescribed for Plaintiff's reduction of nightmares to Prazosin, continue Plaintiff's psychotherapy with Ms. Gebhart, and have Plaintiff limit his caffeine intake. *Id.*

June 3, 2015 treatment notes from Regional Neurology and Sleep Medicine where Plaintiff followed up for headaches indicated that Plaintiff had no depression, no suicidal or homicidal ideas, and he was alert and oriented, with normal concentration and attention, normal insight and judgment, and normal speech and memory. Tr. at 795. Plaintiff took a PHQ-9 depression screening on July 9, 2015 at the neurology clinic and results indicated that he had minimal depression. *Id.* at 796. Plaintiff's medical records for 2016-2019 from the neurology clinic show mental status examinations primarily indicating that Plaintiff had no depression, no homicidal or suicidal thoughts, and no hallucinations. *Id*. at 801, 804, 807, 809-810, 813, 955, 962, 970, 978, 986, 994, 1004, 1009, 1017, 1023, They also showed that Plaintiff was alert and oriented, had normal concentration and attention, normal expressive and receptive speech, intact immediate long and short recall, and limited to normal insight and judgment. *Id*. at 785, 788, 791, 794-795, 800-801, 805, 808, 811, 814, 956, 963, 971, 979, 987, 995, 1004, 1009, 1027-1028, Notes from Allwell Behavior Health Services showed that Plaintiff had some improvement upon taking Luvox, but no change in his depression. *Id*. at 1003. His mood was euthymic, with normal speech and thought content, no hallucinations, intact associations, and orientation, attentiveness, and good judgment. *Id*. at 1004, 1009, 1153, 1162. He reported "ups and downs" in his mood

4

on October 17, 2016, some small improvement in his depression, but no improvement in his anxiety on that date. *Id.* He also denied hallucinations or homicidal or suicidal ideations. *Id.* He reported panic attacks at his initial evaluation, as well as isolated behaviors, sadness, constant nervousness, anger and aggression, impaired attention span/distractibility, and flashbacks of past abuse. *Id*. at 1153-1154. He also reported problems sleeping due to nightmares about his childhood. *Id*. at 1177, 1179. His psychological examination was deemed abnormal, as he was anxious, angry, irritable, depressed and had a flat affect. *Id*. at 1086. He was also hostile, mistrustful, withdrawn, preoccupied, and agitated, although his insight and judgment were found to be "pretty good," his behavior functioning was good, and he had fair cognitive functioning. *Id*. at 1085-1086. Plaintiff was diagnosed with generalized anxiety disorder and obsessive-compulsive disorder. *Id.* at 1085-1086. On June 18, 2018, Dr. Balogh at Allwell wrote a letter indicating that Plaintiff suffers from PTSD and Adjustment disorders with mixed anxiety and depressed mood. *Id.* at 13. He indicated that Plaintiff would benefit from an emotional support dog and companion for his mental health. *Id*.

At the initial level of agency consideration, Dr. Edwards, Ph.D. reviewed the medical records and looked at Listing 12.04 for affective disorders and Listing 12.06 for anxiety-related disorders. Tr. at 93. He opined that Plaintiff was mildly restricted in his daily living activities, moderately restricted in social functioning and in maintaining concentration, persistence or pace. *Id.* at 94. Dr. Edwards opined that Plaintiff could complete simple 1-3 step tasks in a relatively calm setting which did not require strict pace or production quotas, he would require a flexible break schedule, he could interact on an occasional and superficial basis with familiar others in a nonpublic setting, and he could cope with ordinary and routine changes in the work setting that is not fast-paced and he would need flexibility concerning time limits and production standards. *Id*. at 96-99.

On January 20, 2016, Dr. Reece, Psy.D., evaluated Plaintiff at the request of the agency. Tr. at 939. Plaintiff indicated that the nature of his disability was DDD and "a lot of depression." *Id.* He indicated that he was homeless and living with friends at times. *Id.* He was separated from his wife and he had three children. *Id.* He talked about his upbringing in foster homes since

5

his mother was a drug addict and he was adopted when he was 13 years old. *Id*. He reported abuse by foster parents and siblings, and his adoptive mother's boyfriend. *Id*. He completed the 11th grade and did not go further because he got into fights, was teased by others and bullied, and he had trouble with some teachers and did not attend school regularly. *Id.* at 940.

Dr. Reece found Plaintiff to be cooperative, with no eccentric or impulsive behaviors, good eye contact, normal tone of voice, no psychomotor agitation or retardation, and well-organized associations. Tr. at 941. He noted that Plaintiff's affect was constricted, with some inappropriate chuckling, and his prevailing mood was mild to moderately dysphoric and anxious, with some crying. *Id.* Dr. Reece found that Plaintiff was alert, clear and not confused, he was oriented, had fair short-term and working memories, fair abstract reasoning, fair social insight, and satisfactory concentration, task persistence and pace for problem solving. *Id.* He diagnosed recurrent mild major depressive order, unspecified anxiety disorder, and unspecified trauma and stressor related disorder. *Id.* at 942.

As to a functional assessment, Dr. Reece opined that Plaintiff was able to follow directions at the examination and reported past work problems in comprehending and retaining oral and written instructions. Tr. at 943. He opined that Plaintiff's concentration was satisfactory during the exam, although Plaintiff reported past work problems as to sustaining concentration. *Id.* As to responding appropriately to supervision and coworkers, Plaintiff reported he had a series of sustained relationships, but he had conflicts with coworkers and supervisors in the past. *Id*. Plaintiff had reported that with prior stress and pressures in the workplace, he would walk away. *Id*. Dr. Reece opined that Plaintiff's deficits in dealing with workplace stress were his depression, emotional instability, and anxiety. *Id*.

On April 25, 2017, Licensed Independent Social Worker ("LISW") Gahr of Behavioral Healthcare Partners, completed a mental impairment questionnaire in which she indicated that she started treating Plaintiff on June 29, 2016 and had 13 sessions with him. Tr. at 997. She indicated her diagnoses as general anxiety disorder, obsessive-compulsive disorder, bipolar, and depression. *Id*. She indicated his current GAF as 66, indicative of some mild symptoms. *Id*. She found that Plaintiff was motivated for treatment and showed good progress, but she felt that

6

Plaintiff was near his capacity of the ability to change because of his diagnoses. *Id.* Ms. Gahr listed her clinical findings as depression, anxiety, agitation, hypomania, lability, obsession with death, visual hallucinations, and auditory hallucinations. *Id.* She opined that his prognosis was poor and she check-marked many of the signs and symptoms set forth on the questionnaire, such as anhedonia or pervasive loss of interest in almost all activities, intense and unstable interpersonal relationships and impulsive and damaging behavior, decreased energy, appetite disturbance with weight change, hallucinations, feelings of guilty and worthlessness, impairment in impulse control, mood disturbance, difficulty thinking or concentrating, paranoid thinking, easy distractibility, emotional withdrawal or isolation, recurrent severe panic attacks, bipolar syndrome, and persistent irrational fear of a specific object, activity, or situation. *Id.* at 998.

Ms. Gehr opined that Plaintiff was "unable to meet competitive standards" in the areas of: maintaining attention for two-hour segments; understanding, remembering and carrying out detailed instructions; maintaining regular attendance and being punctual within customary, usually strict tolerances; working in coordination with others without being unduly distracted; asking simple questions or requesting assistance; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; and in dealing with the stress of semi-skilled and skilled work. Tr. at 999-1000. She further opined that Plaintiff was "seriously limited" in the areas of: remembering work-like procedures; understanding and remembering very short and simple instructions; sustaining an ordinary routine without special supervision; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions. *Id.* Ms. Gehr further opined that Plaintiff was limited in, but could satisfactorily carry out very short and simple instructions. *Id.* at 999-1000. In explaining her limitations, Ms. Gehr wrote that attendance and attention would be problems for Plaintiff even with treatment because Plaintiff needs to be reminded of what he is doing and expectations. *Id.* She further

7

indicated that Plaintiff had problems with anger management, decision-making, he had a lack of focus, low frustration tolerance, and problems accepting criticism. *Id.*

Ms. Gehr also opined that Plaintiff was seriously limited in interacting appropriately with the general public, maintaining socially appropriate behavior, and using public transportation. Tr. at 1000. She found that Plaintiff was limited but could satisfactorily travel in unfamiliar places, and he had unlimited or very good abilities to adhere to basic standards of neatness and cleanliness. *Id.* She remarked that Plaintiff's depression increased his pain and symptoms. *Id.*

As to functional limitations, Ms. Gehr opined that Plaintiff had no or mild limitations in his activities of daily living, and marked limitations in maintaining social functioning and in maintaining concentration, persistence, or pace. Tr. at 1001. She noted that Plaintiff had one or two episodes of decompensation within 12 months. *Id.* She further checked the boxes that indicated that Plaintiff had a medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation or ability to do any basic work activity, with symptoms or signs attenuated by medication or psychosocial support, and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. *Id.* Ms. Gehr also checked the box indicating that Plaintiff had an anxiety-related disorder and complete inability to function independently outside the area of his home. *Id.* She opined that Plaintiff would be absent from work more than four days per month due to his symptoms or treatment, and his impairments have lasted or could be expected to last at least twelve months. *Id.* at 1002. She indicated that Plaintiff was not a malingerer and his impairments were reasonably consistent with the symptoms and limitations that she marked in the evaluation. *Id.* When asked to describe additional reasons for why Plaintiff would have difficulty working at a regular job on a sustained basis, Ms. Gehr wrote: "Client anger is extreme when he feels minimized or does not understand or cannot meet expectations." *Id.* She further opined that Plaintiff could not manage benefits on his own if they were awarded. *Id.*

In the first six sessions between Ms. Gehr and Plaintiff, she did not record a complete mental status examination, although she marked boxes indicating no significant changes had occurred.  Tr. at 1033-1047.  In November of 2016, Ms. Gehr indicated notable changes in that Plaintiff reported higher anxiety and anger, that he felt the walls were closing in on him, and he was less patient and more anxious. *Id*. at 1049.  Plaintiff reported in late November of 2016 that his sister-in-law had moved in with him and his wife with her four children because of a fight with her drug-addicted husband and then the husband moved in as well. *Id.* at 1053.  In January of 2017, Ms. Gehr noted that Plaintiff and his wife were raising his sister-in-law's four children ages 2-7 and Plaintiff's mood was "much improved," his thought process was "clear," and he reported that raising the children was beneficial to him as his anger was better and his "life was better all the way around."  *Id*. at 1057-1058.  He explained that his life was better because he had less time to focus on himself, he had more structure, and he was doing something for others and taking his medications. *Id.* at 1058.  In May of 2017, Ms. Gehr noted that Plaintiff had increased depression and negativity, but he felt good about his progress as he "learned how to turn negative in[sic] positive." *Id*. at 1076.

Plaintiff also received medication management from Ms. Mason, a nurse practitioner at Behavioral Healthcare Partners.  Tr. at 1026.  On August 15, 2016, she noted that Ms. Gehr believed that Plaintiff had anxiety disorder and bipolar disorder. *Id*.  Plaintiff reported and described his past, and his panic attacks, fear of dying, depression, and anxiety. *Id.*  Ms. Mason's mental status examination indicated that Plaintiff was engaged and cooperative, but did not seem to want to make eye contact, he had organized and clear speech and thought process, no evidence of psychosis, he was alert and oriented, and he was anxious and had limited insight and judgment concerning his mental health symptoms. *Id.* at 1026-1028.  She diagnosed Plaintiff with social phobia, panic disorder without agoraphobia, obsessive-compulsive disorder, and major depressive disorder single episode. *Id*. at 1030.  She prescribed Plaintiff 50 milligrams of Fluvoxamine to be taken once per day. *Id.* at 1028.

Plaintiff indicated that he had some small improvement in his anxiety after taking the Fluvoxamine when he returned to see Ms. Mason on September 13, 2016, but no change in his

9

depression and obsessive-compulsive disorder. *Id.* at 1003.  He denied hallucinations and side effects. *Id.* Plaintiff's mental status examination showed a full and relaxed but euthymic affect, normal speech, thought process and thought content, intact associations,  good insight and judgment, and he was engaged and attentive. *Id.* at 1003-1004.  Ms. Mason increased Plaintiff's Fluvoxamine to 100 milligrams once per night. *Id*. at 1005.

On October 17, 2016, Plaintiff followed up with Ms. Mason and he reported slight improvement in his depression, but no change in his anxiety. Tr. at 1008.  He indicated that his sleep specialist started him on Trazadone which was helpful in getting him to sleep. *Id*.  Ms. Mason noted that Plaintiff was engaged, friendly and cooperative, his mood was euthymic, with full affect, clear and normal speech, thought process and thought content, no hallucinations, intact associations, good judgment, and he was engaged and attentive. *Id*. at 1009.  She increased the Fluvoxamine frequency to twice per day. *Id*. at 1010.

Plaintiff began seeing Dr. Box on December 27, 2016 for his medication management after Ms. Mason left the clinic.  Tr. at 1013.  He reported that there was no change in his obsessive-compulsive behaviors of going back into his house to check the locks and things being in the exact same places. *Id*. Dr. Box added 50 milligrams of Clomipramine twice a day and tapered Plaintiff off of Fluvoxamine. *Id*. at 1013, 1015.  She diagnosed bipolar disorder, current episode depressed and severe, but without psychotic features, generalized anxiety disorder, and obsessive-compulsive disorder. *Id.* at 1014.  Plaintiff reported to Dr. Box on February 8, 2017 that his worrying was much worse since tapering the Fluvoxamine and he wished to go back on that medication. *Id*. at 1016.  She added the Fluvoxamine back to his medication regimen. *Id*. at 1019.  On June 6, 2017, Plaintiff reported no side effects and no changes since getting back on Fluvoxamine and he indicated that "Life was OK." *Id.* at 1021.  Dr. Box increased the dosage to 300 milligrams. *Id*.

Plaintiff thereafter presented to Allwell Behavioral Services and on July 27, 2017 an evaluation was performed by Ms. Patterson. Tr. at 1137.  She indicated that Plaintiff had anger, depression and anxiety and he discussed his past abusive history in foster care, his drug-addicted mother, and his treatment with Behavioral Healthcare Partners. *Id*. at 1137-1140.  In the mental

10

status examination, Ms. Patterson noted no remarkable findings as to Plaintiff's general body movements, facial expressions, quality of speech, feeling, perceptions or hallucinations, his intellectual functioning, or his orientation. *Id*. at 1140-1141. She indicated that Plaintiff had insight into his behavioral issues, and found that he had no impairment in his judgment or memory. *Id*. at 1142. He described his social anxiety that had worsened, his panic attacks, anger, sleep problems, and depression. *Id.* at 1142-1144. She diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood and alcohol dependence. *Id.* at 1144. She checked that Plaintiff's length of treatment would be 6-12 months. *Id*. at 1145. Dr. Balogh performed his own evaluation for medication management and diagnosed Plaintiff with PTSD, adjustment disorder as indicated by Ms. Patterson, alcohol dependence, and attention-deficit hyperactivity disorder. *Id.* at 1155. Dr. Balogh prescribed Guanfacine for the attention-deficit disorder and Lorazepam for anxiety. *Id*. at 1154. On January 9, 2018, Plaintiff followed up with Dr. Balogh and reported that he was doing "OK" with the medications and the Lorazepam was helping. *Id*. at 1158. He checkmarked normal findings on the mental status examination, discontinued the Guanfacine and continued the Lorazepam. *Id*. at 1163.

### III.    **RELEVANT PORTIONS OF THE ALJ'S DECISION**

On May 4, 2018, the ALJ issued a decision finding that Plaintiff was not disabled. Tr. at 17-31. The ALJ stated that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2018. *Id.* at 20. He further found that Plaintiff had not engaged in substantial gainful activity since July 30, 2014, Plaintiff's alleged amended onset date. *Id.* The ALJ determined that Plaintiff had the following severe impairments: DDD in the cervical spine; status post anterior cervical discectomy and fusion; occipital neuralgia; DDD in the lumbar spine; obesity; PTSD; and major depressive disorder. *Id.* The ALJ then indicated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

After considering the record, the ALJ found that Plaintiff had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), except for the following limitations: occasionally operating left foot controls; limited occasional reaching overhead with

11

the left upper extremity; all other reaching, handling and fingering with left upper extremity and left extremity is frequently; occasionally pull and push with left upper extremity; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; never work at unprotected heights or tolerate any exposure to moving mechanical parts; limited to understanding, remembering and carrying out simple, routine, and repetitive tasks, but not at production rate pace (e.g. assembly line work); occasional interaction with supervisors and coworkers; but never interacting with the public. Tr. at 22. The ALJ then found that Plaintiff was unable to perform any past relevant work. *Id.* at 29. He further found that Plaintiff was a younger individual age 18-49 on the alleged date of disability, had at least a high school education, and is able to communicate in English. *Id.* at 29-30. Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that the Plaintiff can perform, including the jobs of mail clerk, routing clerk, and hand bander. *Id.* at 30. Ultimately, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from November 10, 2013 through the date of his decision, May 4, 2018. *Id.* at 31.

### IV.    **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to Social Security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The plaintiff has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.     **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6thCir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 937 (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009)) (internal citations omitted). Therefore, even if an ALJ's decision is supported by substantial evidence, "a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a plaintiff on the merits or deprives the plaintiff of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   LAW AND ANALYSIS

Plaintiff contends that the ALJ's RFC finding lacks substantial evidence because he left out a limitation of "<u>flexibility in breaks, time limits, and production standards</u>," that Dr. Rudy, Dr. Edwards, and Ms. Gehr all agreed was necessary. ECF Dkt. #15 at 7 (emphasis in original). Plaintiff avers that these mental health professionals identified these limitations, and they also identified anger management issues, trouble dealing with others, and isolated behavior, which further supported the need for the restrictions. *Id.* Plaintiff notes that while the ALJ did address the limitations, he erroneously found that no evidence supported it. *Id.* at 8, citing Tr. at 7-11.

In his decision, the ALJ set forth the opinion of Dr. Rudy, an agency mental health consultant and attributed it "some weight." Tr. at 27. He explained that he gave the opinion "some weight" to the extent it was consistent with the "overall evidence." *Id*. He further stated that, "I note, however, that there is no support for the doctor's assessment that the claimant required a flexible break schedule." *Id*. The ALJ set forth state agency reviewing psychologist Dr. Edwards' assessment as well, and also attributed it "some weight to the extent consistent with the overall evidence." *Id.* at 28. He also stated that, "I note, however, that there is no support for the doctor's assessment that the claimant required a flexible break schedule." *Id.* And finally, the ALJ addressed Ms. Gehr's opinions and attributed them "little weight, however, as inconsistent with the treatment record, including grossly benign mental status examinations with the exception of varying moods at times." *Id*. at 29.

Drs. Rudy and Edwards are state agency reviewing psychologists. As such, they are considered highly qualified specialists and experts in Social Security disability evaluation. SSR 96–6p, 1996 WL 374180. The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program

physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. §§ 404.1527(f)(2); 416.927(f)(2)[3]. An ALJ is not required to explain why he favored one examining opinion over another as the "good reasons" rule requiring an ALJ to explain the weight afforded a treating physician's opinion does not apply. *See Kornecky v. Comm'r of Soc. Sec.,* 167 Fed.Appx. 496, 508 (6th Cir. 2006). In addition, ALJs are not bound by the findings of state agency psychologists, "but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-8p. The regulations require an ALJ to "consider" all the medical opinions in the record as well as "evaluate" them considering the factors of 20 C.F.R. §§404.1527(c) and 416.927(c). 20 C.F.R. §§ 404.1527(b),(c), 416.927(b)(c). These factors include the examining relationship; the treatment relationship, including the length of the treatment relationship and the frequency of examination as well as the nature and extent of the treatment relationship; supportability; consistency; specialization; and other relevant factors that tend to support or contradict the medical opinion. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

A claimant's RFC is an assessment of the most that a claimant "can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)1), 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. §§ 404.1545(a)(2)(3), 416.945(a)(2)(3). The claimant bears the responsibility of providing the evidence used to make a RFC finding. 20 C.F.R. §§ 404.1545(A)(3), 416.945(a)(3). However, the RFC determination is one reserved for the ALJ. 20 C.F.R. §§ 404.1545(c), 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. SSR 96-8p provides guidance on assessing RFC in social security cases. SSR 96-8p. The Ruling states that the RFC assessment must

---

[3]The cited regulations continue to apply to social security claims filed before March 27, 2017. 20 C.F.R. §§ 416.920c, 416.927. However, 20 C.F.R. § 416.920c applies to claims filed on or after March 27, 2017. *Id*. Since Plaintiff's applications were filed before March 27, 2017, the prior rules apply, as properly applied by the ALJ.

15

identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis. *Id*. Further, it states that the RFC assessment must be based on all of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, a need for a structured living environment and work evaluations. *Id*. SSR 96-8p further provides that:

> The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p.

In the instant case, the ALJ applied the proper legal standards in addressing the agency reviewing psychologists' opinions and the weight that he gave those opinions. He specifically referred to the opinions and limitations and he explained the weight that he attributed to those opinions. Tr. at 27-28. The undersigned recommends that the Court find no merit to Plaintiff's assertion that the ALJ violated SSR 96-8p by failing to explain why he did not adopt the specific flexibility limitations that Drs. Rudy and Edwards opined for Plaintiff. ECF Dkt. #15 at 7-12.

The undersigned first notes that Drs. Rudy and Edwards were not entirely definitive with the flexibility limitations as they indicated that Plaintiff "would benefit" from a flexible break schedule due to symptom fluctuations and "he would need some flexibility in terms of time limits and production standards." Tr. at 98-99, 133. They did not define the degree of "some flexibility" with regard to time limits and production standards. *Id.* In fact, they both opined that Plaintiff could cope with the ordinary and routine changes in a work setting that is not fast-paced and he could work in a calm setting that did not require strict production quotas or pace quotas. *Id.* The ALJ accepted these particular limitations by restricting Plaintiff to simple, routine, and repetitive tasks that were not at a production rate pace. *Id*. at 22.

Further, while the ALJ stated that support was lacking for the flexible break schedule recommended by Drs. Rudy and Edwards without further explanation when he discussed their opinions, he did elaborate on this statement elsewhere in his decision. Tr. at 27-29. The Sixth Circuit has endorsed supporting a conclusion in a particular step of the ALJ's decision by looking

16

to factual findings elsewhere in that decision. *See generally Forrest v. Comm'r of Soc. Sec.*, 591 Fed.Appx. 359, 365-66 (6th Cir. 2014) (finding that the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three); *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411 (6th Cir. 2006).

In addition to concluding that neither Dr. Rudy nor Dr. Edwards provided support for the flexible break schedule limitation, the ALJ earlier in his decision indicated that he considered Plaintiff's medical management and therapy treatment. Tr. at 27. He explained that although at times the treatment notes indicated that Plaintiff required some limitations, improvement was also noted on medication and with therapy. *Id.*

The ALJ also addressed his decision to not include the flexible break schedule limitation when he addressed Ms. Gehr's opinion and attributed it "little weight." Tr. at 27-28. In explaining the weight that he gave to the opinion, the ALJ also explained that he did not include many of Ms. Gehr's restrictions in his RFC for Plaintiff, which included marked limitations in Plaintiff's abilities to maintain social functioning and maintaining concentration, persistence or pace. Tr. at 29. The ALJ noted Ms. Gehr's findings that Plaintiff was unable to meet competitive standards in many areas, including maintaining attention for two-hour segments, maintaining regular attendance, being punctual, working with others without being distracted, asking simple questions or asking for assistance, getting along with others, responding appropriately to work setting changes. Tr. at 28. The ALJ also set forth Ms. Gehr's opinion that Plaintiff had serious limitations in other domains, such as sustaining an ordinary routine without special supervision, making simple, work-related decisions, performing at a consistent pace without unreasonable numbers and length of rest periods, and dealing with work stress. *Id*. at 29. He further noted that Ms. Gehr had opined that Plaintiff had marked limitations in maintaining social functioning and in maintaining concentration, persistence, or pace, and she believed that he would miss more than four days per month of work due to his treatment or symptoms. *Id.*

As a licensed social worker, Ms. Gehr is a not an "acceptable medical source" under the Social Security law effective at the time of the filing of the instant case. Social Security Ruling 06-3p ("SSR 06-3p"). SSR 06-3p, which was in effect at the time of the filing of the instant case,

17

outlined how the agency considered opinions from those that were not "acceptable medical sources." SSR 06-03p, 2006 WL 2329939, at *2.[4] SSR 06-03p. It indicated that the ALJ should reflect that he or she has considered the opinions of non-acceptable medical sources:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-3p. The Sixth Circuit interpreted this ruling to mean that an ALJ should discuss the 20 C.F.R. § 404.1527 and 416.927 factors relating to treatment, in order to provide a basis for why the ALJ was rejecting the opinion. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) ("The factors set forth in 20 C.F.R. § 404.1527, which under the regulation apply only to medical opinions from acceptable medical sources, nevertheless 'represent basic principles that apply to the consideration of all opinions from medical sources ... who have seen the individual in their professional capacity.'") (citing SSR 06-3p).

Here, the ALJ did not entirely reject Ms. Gehr's opinion and he did not point out that she was not an "acceptable medical source" as a licensed social worker Tr. at 29. Rather, he discussed Ms. Gehr's opinion, attributed it "little weight," and explained that he did so because it was inconsistent with the treatment record, which showed "grossly benign mental status examinations with the exception of varying moods at times." Tr. at 29. Elsewhere in his decision, the ALJ also cited to medical records at Behavioral Healthcare Partners from 2016-2017 which showed that Plaintiff had mild improvement with medication, relatively normal mental status examinations, good judgment, full orientation, and engaged and attentive concentration. *Id*. at 27. He noted Plaintiff's varying moods, but he also noted that indications in late 2016 showed that Plaintiff reported that his anger was better, he was enjoying a more structured life,

---

[4] This Ruling has been rescinded effective March 27, 2017, but still applies to claims filed before March 27, 2017, like the instant claim. Fed. Reg. Notice Vol. 82, No. 57, Page 15263, effective Mar. 27, 2017.

he had lost 40 pounds in mid-2017 to reduce his pain, and he was doing better. *Id*. The ALJ further noted that Plaintiff reported improvement with medications and psychotherapy. *Id*.

Thus, while the ALJ did not fully explain his reasoning for not adopting the flexible break schedule limitation when he evaluated each of the opinions of Dr. Rudy, Dr. Edwards and Ms. Gehr, he did properly consider those opinions, assigned them appropriate weight, and elaborated elsewhere in his decision the reasons for not incorporating the flexibility limitation into his RFC for Plaintiff. He properly included the production pace restriction that each had opined for Plaintiff for his moderate limitations in concentration, persistence, or pace, and he also limited Plaintiff to simple, routine, and repetitive tasks with occasional interaction with coworkers and supervisors and no interactions with the public. Tr. at 22. He further explained that none of the three mental health professionals provided support for the flexible break schedule limitation, and he cited to Plaintiff's treatment records which showed many normal mental status examinations, Plaintiff's reports of feeling better with less anger, situational stressors, and Plaintiff's reports of seeing improvement on medications and with therapy. Accordingly, the undersigned recommends that the Court find that the ALJ properly determined that a flexible break limitation was not necessary and substantial evidence supports the ALJ's determination on that issue.

## VII. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: March 4, 2020          */s/George J. Limbert*
                             GEORGE J. LIMBERT
                             UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).